## Case No. 11,474.

### The PURITAN.

[7 Ben. 571.][1]

District Court, E. D. New York. Jan., 1875.

SALVAGE BY STEAMTUGS NEAR A PORT—DERELICT
—APPORTIONMENT.

1. The ship P., in endeavoring to enter the harbor of New York, struck on the False Hook, a bar running parallel to Sandy Hook. The channel to the west, between it and Sandy Hook, is about 300 yards wide, and to the east of it is the open sea. The wind was blowing a gale directly on shore, and the ship pounded so hard on the shoal that in fifteen minutes she had eight feet of water in her, and soon after portions of her keel came up alongside. A powerful tug, the C., came near her, and the captain and crew of the ship, thinking that the ship would not come off from the shoal, left her and went up to New York in the C. Another tug, the W., had also in the mean time approached, but her captain, seeing the condition of the ship, also thought she would never come off, and she went away looking for other business. About an hour afterwards, two other tugs, the J. G. N. and the J. M., seeing the flag of distress which had been left flying, went to the ship and found her abandoned. They lay by her, and after a while found that she was moving, and was about to come off the shoal on the inshore side. Having agreed to share in the salvage, they ran in close to her, and put on board four men, and got a hawser to her, when she came off the shoal, and they succeeded in towing her round the point of Sandy Hook into the bay, where they put her on the mud, pumped her all night, and the next day at noon brought her to a dock in safety. When the captain of the W. saw the ship moving, he came up also and offered his assistance to the two tugs, which then were towing the ship, but it was refused. The captain of the ship on the tug C., on his way up to New York, left word with a wrecking company to be ready to go to the ship. He left his crew in New York, and the next morning early he went himself on board the C., and went to look for the ship, and found her on the mud in charge of the salvors. The owners of the two tugs filed a libel for salvage. The owners of the C. also filed a petition claiming salvage. The ship and her cargo and freight were worth from $225,000 to $237,000. The tugs were worth one of them $9,000, and the other $17,000. Each of them had a crew of six all told, and on one of them was a boy who had gone with the tug for a pleasure trip: *Held*, that in view of the peril to the property, the value of the property saved, the risk of loss of the tugs, and the danger to the lives of their crews—such danger and risk was not excessive, and the services lasted about twenty hours—the sum of $30,000 was a proper amount of salvage to be paid to the two tugs.

2. The C. was not entitled to recover salvage.

3. The amount of salvage should be divided equally between the two tugs. The masters of them should receive $3,000 each; the men who went on board the ship, and especially one who took charge on board of her, should receive a higher rate than their fellows; and the rate of wages afforded a proper criterion by which to fix the shares of the men.

In admiralty.

Benedict, Taft & Benedict, for libellants.

W. R. Beebe, for petitioner.

Scudder & Carter and A. F. Smith, for claimants.

BENEDICT, District Judge. This action is brought by the owners and crews of two steamtugs, called respectively the Jacob G. Neafie and the Jacob Myers, to recover for salvage services rendered to the ship Puritan.

On the 17th day of April, 1874, the ship Puritan, laden with a valuable cargo, when attempting to enter the harbor of New York during an easterly gale, grounded upon what is called by some the Outer Middle, but on the charts is named the False Hook—a shoal lying outside of Sandy Hook, between which and Sandy Hook there runs a narrow channel three or four hundred yards wide, and outside of which to eastward is the open sea. At the time the ship grounded on this shoal the waves broke heavily about her, and she pounded, so that in a very short time portions of her keel appeared on the surface of the water, and she was found to have made eight feet of water in her hold within ten or fifteen minutes after striking. While in this condition she was approached by the steamtug Cyclops, a powerful tug, when all on board left the ship in a boat, and went on board the Cyclops, and proceeded to New York, leaving the ship abandoned, and, as was supposed, permanently fast upon the shoal. Afterwards, on the same day, the tugs Neafie and Myers, while proceeding down the bay, inside, observed the ship with her signal of distress flying. They at once proceeded to her assistance. Upon reaching her they found no one on board, and that it was impossible to assist her, as she then lay. They did not, however, depart, but remained by her with the intent to afford her aid if the opportunity should arise, as it was observed by them that the action of the heavy seas upon the ship seemed likely to drive her over the shoal. This actually occurred, and after the lapse of an hour or so it was seen that the ship was about to come off the shoal on the inside. Thereupon the two tugs, having first come to an understanding to share in the labor and the reward, placed four men on board of her, and having got out hawsers, took her in tow as soon as she cleared the shoal, and succeeded in towing her past the Hook in safety, and in placing her upon the mud at the Horse Shoe, in the Lower Bay. She was there pumped all night, and the next morning was

[1] [Reported by Robert D. Benedict, Esq., and B. Lincoln Benedict, Esq., and here reprinted by permission.]

brought by the salvors to a wharf in Brooklyn. A dispute thereupon arose between the salvors and the owners of the ship and cargo as to the amount of compensation to be paid for the services rendered by these two tugs, to determine which the present action has been brought.

The parties differ widely—the libellants asking for a large reward as for a salvage service of unusual merit; while the claimants earnestly contend that one thousand dollars would be a liberal compensation. This difference arises mainly from a dispute as to the proper effect of the evidence in regard to two controlling features of the case. The libellants insist, that the ship was rescued from a position of great danger, inasmuch as, without the aid of these tugs, she would have been driven by the storm upon the exposed beach of Sandy Hook, outside; while the claimants contend, that, without any aid from the tugs, the ship would have drifted past the Hook, and into safe water, in the Lower Bay.

Upon this question of fact, I am of the opinion that the evidence fails to sustain the position taken by the claimants. The weight of evidence shows, that the ship, when she came off the shoal, would, if unaided, have been driven upon the beach, which was some three or four hundred yards to leeward, and would there have sustained very great damage, and have been put in peril of total loss of the ship and her cargo. This appears not only from the testimony of the salvors, but from that of the captain of the Walcott, a disinterested person, who returned to the ship after the libellants had taken hold, and who states, that, with two tugs towing the ship, it was all they could do to keep her off the beach.

A second great point of controversy is this: The claimants contend, that the ship was not rescued from danger, because she came off the shoal without aid, and then not only were the two tugs of the libellants there, but the Walcott—also a powerful tug—was at hand. It is said, therefore, that these tugs should be deemed to be competitors for a towage service there to be performed, and that whatever either of them would have been willing to have been employed for, to perform the service, is a fair price for the Puritan to pay. The evidence, in respect to the Walcott, is, that, in the afternoon, having been informed by a Sandy Hook pilot that the Puritan was ashore, she steered towards her by compass—the weather being then too thick to enable the ship to be seen—and found the Cyclops at the ship. As the Walcott was expecting a Calcutta ship, she remained outside, and for a time in the neighborhood of the Puritan. After the Cyclops departed for New York with the Puritan's crew on board, the Walcott departed, because the captain judged it to be useless to stay. He says, he did not think the ship would come off; she looked bad; he did not calculate she would ever get off, except in pieces. Afterwards, when he saw the Neafie and the Myers at the ship, he ran in again near to her, and was ready to afford additional aid, if such aid had been required. I am unable to see how the presence of the Walcott, under such circumstances, can affect the claim of the libellants. The Walcott certainly had no idea of being able to rescue the ship. She had departed on her own business, and it cannot be known that she would have returned to the ship at all, if she had not observed the Neafie and the Myers there. When she did return, her presence was of no value, for the other tugs already had hold of the ship, and were safely conducting her towards the harbor. Moreover, it is not certain that, when the Walcott arrived, she could have saved the ship. She was, no doubt, powerful enough to tow the ship, but she was not on the spot when the ship began to move; and, situated as this ship then was, time was everything. A little delay would have carried the ship so near to the beach that no tug could have then rescued her. One of the witnesses says that the ship would have been ashore in ten minutes after she began to move, if it had not been for the exertions of the libellants. Furthermore, the service of the Neafie and the Myers to this ship commenced when, in answer to her signal of distress, they put out from the harbor into the open sea; the service continued while they lay by her, in order to be able to render the instant assistance demanded by the position of the ship when she came off the shoal, and it did not terminate until the vessel was moored at the Brooklyn wharf. It is difficult to see why the promptness and zeal displayed by these two tugs should be held less meritorious because another tug, which had entertained no idea of being able to aid the ship, presented herself while they were in the act of affording aid. Nor does it strike me as reasonable to say that the position of this ship was that of a vessel free from danger, having three tugs by her competing for the employment of towing her to the harbor. The ship was abandoned. There was no one there to employ the tugs, and the tugs were under no obligation to tow her, without being employed.

Although under no obligation to do it, these two tugs did voluntarily aid this ship, and, by combining their efforts, they were enabled to do what neither of them could have done alone, namely, to save the ship from going ashore. To bring about precisely such results, is the sole object of the law of salvage; and, in my opinion, it would be a violation of that law to refuse to these salvors the liberal reward which the maritime law holds out as an inducement to exertion on the part of those who may be so situated as to be able to render service to a ship in distress. The luck of being in a position to render assistance to a ship in distress, the maritime

law makes good luck, to the end that distressed ships may receive all possible aid. My conclusion, therefore, is that the grounds upon which the claimants have based their refusal to pay the libellants a salvage reward are untenable, in view of the evidence, and that the libellants are entitled to a liberal salvage reward. There remains, then, but to notice some features of the case, in addition to those already alluded to, which, in accordance with established rules, are to be taken into account in determining the amount to be awarded. It·is said that these tugs incurred no danger, inasmuch as they kept at a respectful distance from the laboring ship as long as she was pounding on the shoal. But it was useless then to approach near to her. The evidence is that nothing could be done until the ship freed herself from the shoal. To keep out of danger until the time when exposure to danger would avail something, is no fault to be blamed, but a prudence to be commended.

When the ship moved, the tugs did not shrink from exposure to danger, for it cannot be said that no danger was incurred when one of the tugs, in order to put men on board the ship, approached her near enough to enable the men to jump on board. Such an approach to such a large ship, in such a sea, required great care and skill, and could not be accomplished without danger, not only of the destruction of the tug, but also of the lives of the men themselves. Nor can it be said, upon the evidence, that danger was not present from the time the tugs passed out of the harbor. The precautions taken on board the tugs show that the idea of peril was present.

The exertions of the salvors after the ship was safely located upon the mud in the Horse Shoe are also worthy to be considered. Their efforts did not slack when the safety of the ship herself had been secured, but were continued and were incessant during the night, in the hope of saving the cargo from further damage, by which means the cargo was delivered much less damaged than was to have been expected. When vessel and cargo both are saved, the reward is to be increased. Marv. Wrecks, p. 119.

The number of persons, twenty-one in all, who are entitled to share in the reward, should also be considered. The value of the tugs themselves—one being worth $9,000, and the other $17,000—must be taken into the account, for at more than one period of the service, a breakage of the engine or of the steering gear of either tug would at once have brought her in danger of destruction.

The value of the property saved is very large. The cargo, as saved, is conceded to be worth $168,700. The freight earned was $28,531. The ship herself in her damaged condition is valued by the claimants at $20,000, and by the libellants at $37,000. The total value saved was from $222,000 to $234,000.

Where the amount saved is large, the reward is for that reason increased. On the other hand, it is not to be forgotten that no excessive danger to life or property was incurred by these salvors; that the services did not extend over a long period of time, being about twenty hours in duration; that all the expenses to which the salvors were put in hiring men to enable the pumping of the ship to continue without cessation, have been paid by claimants. And it should also be recollected that the amount of the probable loss, if the ship had gone ashore upon the beach, is lessened by the fact that she was at the mouth of a great harbor, and that all the appliances available to remove the cargo, and if possible get off the ship, would have been at the service of the ship early the next morning. The state of the weather made it impossible that any assistance could have reached her during the night.

In view of all the circumstances, and in accordance with the established rules applicable in such cases, I am of the opinion that the sum of thirty thousand dollars is the proper reward to be given in this case.

There is one additional question in this case to be disposed of, which has been raised by a petition to be allowed salvage, filed in the cause on behalf of the steamtug Cyclops, which it will be remembered was the first tug to approach the Puritan, and which, at the request of the master of the ship, took all her crew on board and carried them to New York. It appears that on the way up the Cyclops stopped at the Coast Wrecking Company's docks, where notice of the disaster to the ship was left, and next morning took the master on board again in New York to carry him to the wreck; but on reaching Sandy Hook, the ship was found at the Horse Shoe in custody of the salvors, and they accordingly returned. I see nothing ·in these facts to entitle the Cyclops to salvage reward, and the petition filed in her behalf must be dismissed.

I have been requested to apportion the salvage award between the respective salvors upon the evidence, as it stands, and I accordingly do so.

In view of the understanding had at the time of the performance of the service, I am of the opinion that the tugs should share equally in the reward; and in accordance with precedent I give to their owners one-half. I am also of the opinion that the two masters should share alike; that the men who went from the tugs on board the wreck should receive more than the other seamen, and that of these Hobart should receive the greatest sum, as he in some sort took the responsibility of what was done on board the wreck, after he boarded it; and that the rate of wages affords a proper criterion by which to determine the relative proportions of the men.

I therefore award:

To the owners of the Jacob Myers the
    sum of...................... $7,650
" captain, Charles Brooks (the same to
    include the percentage payable to
    him by the terms of his contract of
    hiring) ...................... 3,000
" Thomas Waldron, engineer......... 1,350
" James Russell, deck hand.......... 1,050
" Frank Roddy, fireman............. 825
" Clement Doty,    "    ............ 525
" Robert Stevenson, cook........... 600
                                ————
                              $15,000

To the owners of the Jacob G. Neafie.. $7,500
" the master, F. H. Cooley........... 3,000
" Peter C. Brown, engineer.......... 1,350
" Benjamin K. Hobart, deck hand... 1,150
" Frank Van Husen, fireman........ 825
" Orser Pelton,      "      ........ 525
" Samuel Riggs, cook.............. 600
" Frank Westervelt, boy passenger... 50
                                ————
                              $15,000